DAVID MARKIN AND BARBARA C. MARKIN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Markin v. Commissioner
Docket Nos. 18245-86; 19805-86; 27384-86
United States Tax Court
T.C. Memo 1989-665; 1989 Tax Ct. Memo LEXIS 665; 58 T.C.M. (CCH) 994; T.C.M. (RIA) 89665; December 21, 1989
*665 Ps claimed deductions and investment tax credits in connection with a motion picture through their interests as limited partners in a partnership. Ps move the Court to vacate a stipulation of fact pursuant to Rule 91(e), Tax Court Rules of Practice and Procedure, on the ground of mutual mistake of fact. Held, Ps' motion for relief under Rule 91(e), Tax Court Rules of Practice and Procedure, is denied. Held further, the partnership did not acquire a depreciable interest in the motion picture but purchased an intangible contract right to payments contingent on the success of the motion picture. Bailey v. Commissioner, 90 T.C. 558 (1988), followed. Held further, the partnership is entitled to depreciate its basis in the contract right and its basis is determined. Held further, the partnership's recourse purchase note is disregarded for tax purposes because the note had no substance and thus is not includable in the contract right's depreciable basis. Held further, Ps are not entitled to an investment tax credit with respect to the film because the partnership did not acquire an "ownership interest" in the film within the meaning of section 48(k)(1), I.R.C.
Held further, Ps are liable *666 for additions to tax under section 6659, I.R.C.
Held further, Ps are liable for additions to tax under section 6621(c), I.R.C.
Held further, Ps are not liable for additions to tax under section 6661, I.R.C.
David A. Schmudde, Eugene D. Silverman, Alan J. Epstein, Hilton Chodorow and Michael C. Cohen, for the petitioners. Frank Agostino and Carroll D. Lansdell, for the respondent. NIMS
MEMORANDUM OPINION NIMS, Chief Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Petitioners
Year
Deficiency
6653(a)
David and Barbara
1979
$ 24,951.00
$ 1,247.55
C. Markin
1980
19,055.00
952.75
1982
53,264.64
-- Estate of Albert
1982
74,562.00
-- Goldberg, etc.
Philip J. Kleiner
1982
29,188.00
-- Additions to Tax - Sections
Petitioners
Year
6653(a)(1)
6653(a)(2)
6659
6661
David and Barbara
1979
--
--
$ 7,485.30
--
C. Markin
1980
--
--
5,716.50
--
1982
$ 2,663.23
50% of
8,244.30
$ 2,578.36
interest due
on $ 53,264.64
Estate of Albert
1982
--
--
--
--
Goldberg, etc. Philip J. Kleiner
1982
--
--
--
--
(Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.) *667 As stipulated by the parties, the issues for decision are whether: (1) Author Associates (the partnership) acquired a depreciable interest with respect to its investment in the motion picture "Author! Author!" (the picture); (2) the partnership may include certain amounts, if any, in the picture's basis; (3) the partnership's basis in the picture is subject to discounting pursuant to section 483; (4) petitioners, as limited partners, are entitled to claim an investment tax credit with respect to their interest in the picture and, if so, in what amount; (5) the partnership's failure to include the statement described by section 1.48-8(g)(3), Income Tax Regs., on its 1982 partnership return precludes petitioners from claiming any investment tax credit with respect to the picture; and (6) petitioners are liable for additions to tax under sections 6659, 6661 and 6621(c), formerly section 6621(d). With respect to certain other issues, the parties have agreed to be bound by final determinations in Madden v. Commissioner, T.C. Memo. 1989-162. This case was submitted fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. The Markins resided *668 in Kalamazoo, Michigan, at the time their petition was filed. The will of Albert Goldberg, deceased (whose estate is one of the petitioners in this case), was duly admitted to probate in New Jersey. Rose Goldberg, Arthur Goldberg and Gary Goldberg, the duly appointed and acting executors of the Estate of Albert Goldberg, and Rose Goldberg (also a petitioner herein) all had their legal residences in Metuchen, New Jersey, at the time their petition was filed. Petitioner Philip J. Kleiner resided in New York, New York, at the time his petition was filed. Motion for Relief under Rule 91(e)
Petitioners filed a motion for relief under Rule 91(e) (motion) on September 1, 1989. On October 2, 1989, respondent filed an objection to petitioners' motion, and on November 17, 1989, petitioners filed a reply to respondent's objection. Petitioners move the Court to vacate paragraph 14 of the stipulation of facts (stipulation 14) which states: Prior to the release of the Picture, Fox had entered into licensing agreements with exhibitors which, provided all amounts were paid when due, would have provided the partnership with sufficient funds to satisfy the principal but not interest on the Recourse *669 Purchase Note. Rule 91(e) provides in part as follows: The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * * Petitioners assert that stipulation 14 resulted from a mutual mistake of fact and is thus voidable in the interests of justice. Respondent contends that there was no mutual mistake of fact and that any such mistake was unilateral on petitioners' behalf. See Stamm International Corp. v. Commissioner, 90 T.C. 315 (1988). We agree with respondent. Mutual mistake of fact generally occurs when there is a misapprehension as to a basic assumption upon which a stipulation rests. Spector v. Commissioner, 42 T.C. 110, 112 (1964). Petitioners contend that the parties entered into stipulation 14 based upon erroneous information provided by an attorney in Twentieth-Century Fox Film Corporation's (Fox) litigation department (Fox litigator). Petitioners have submitted a declaration of Gerald L'Esperance (L'Esperance), a former Fox analyst, and a handwritten schedule. The declaration and schedule purport to show that, contrary to stipulation 14, Fox had not entered *670 into licensing agreements prior to the release of the picture which would have provided the partnership with sufficient funds to satisfy the principal amount of the recourse purchase note (recourse note). Respondent asserts that Frank Agostino (Agostino), respondent's former counsel, was not mistaken when he entered into stipulation 14 on respondent's behalf. Respondent has submitted Agostino's declaration which states that he was lead counsel for respondent in a group of motion picture tax shelter cases classified by respondent as the DeLaurentiis tax shelter project (the DeLaurentiis project). The DeLaurentiis project involved approximately 10 limited partnership investments promoted by Ira N. Smith (Smith) and Stephen R. Greenwald (Greenwald). At the time stipulation 14 was entered into, David Schmudde (Schmudde) served as lead counsel for the investors in all of the DeLaurentiis project cases. Agostino and Schmudde negotiated extensively over the stipulations for each of the DeLaurentiis project cases. As a result of these negotiations, Agostino conceded a potential section 183 issue in several of the cases, including this case. Agostino's concessions were based in part on *671 Schmudde's assertions that the limited partners had little or no risk with respect to the recourse notes. In this case, Schmudde's assertions were supported by the information provided by the Fox litigator. Agostino, an experienced tax litigator, was not led into a mistake by the information. To the contrary, Agostino was fully aware that the information and stipulation 14 were consistent with similar stipulations that he and Schmudde had entered into in other DeLaurentiis project cases. We do not find that stipulation 14 resulted from a mutual mistake of fact. Accordingly, petitioners' motion will be denied. The Partnership
In June, 1982, David Markin, Albert Goldberg and Philip J. Kleiner (Kleiner) became limited partners in the partnership, a New York limited partnership. The stated purpose of the partnership was to acquire rights in the motion picture "Author! Author!" from Fox and to exploit the rights by engaging Fox to distribute the picture. The partnership's general partners were Smith and Greenwald. The picture is a feature length motion picture about a New York playwright at a crisis in both his personal and professional life. His second wife decides to leave home, *672 he has five children to support and the producers of his play are threatening to abandon the production. The cast includes Al Pacino, Dyan Cannon and Tuesday Weld. The picture was directed by Arthur Hiller and produced by Irwin Winkler, and its screenplay was done by Israel Horovitz. Offering Documents
The private placement memorandum (placement memorandum) dated May 24, 1982, stated that the limited partners would be investing an aggregate of $ 4,350,000 in the partnership in exchange for a 99-percent interest in the picture. The $ 4,350,000 would be divided into 25 units offered at $ 174,000 per unit. Partnership units were offered through LPS Securities, Inc. (LPS), an entity wholly owned by Greenwald. The general partners contributed $ 10,000 and received a 1-percent interest. The capital contributions of the limited partners were to be made as follows: Per Unit
For 25 Units
On the date of executing their
$  53,600
$ 1,340,000 subscriptions (together with
promissory notes evidencing the
subsequent annual installments)
On April 1, 1983
35,200
880,000 On March 1, 1984
85,200
2,130,000 $ 174,000
$ 4,350,000  The proceeds from the sales of the partnership units were to be used as follows: Percent of Gross
Proceeds from
Amount
Sale of Units
GROSS PROCEEDS FROM SALE
OF UNITS [1] *673 $ 4,360,000
100.0
OFFERING EXPENSES, INCLUDING
SELLING COMMISSIONS, LEGAL
AND ACCOUNTING FEES AND
FILING FEES [2]
515,000
11.8
NET PROCEEDS FROM SALE OF UNITS
3,845,000
88.2
Use of Net Proceeds
General Partners' Fee
175,000
4.0
Cash Payment for
Picture
500,000
11.5
Marketing Costs for
Picture
2,750,000
63.1
Marketing Consultant
Fee [3]
370,000
8.5
Working Capital
5,000
0.1
Loan Placement Fee [4]
45,000
1.0
$ 3,845,000
88.2 The following summarizes the compensation that was to be paid to the general partners and their affiliates: ENTITY RECEIVING
ESTIMATED
COMPENSATION
TYPE OF COMPENSATION
AMOUNT
Offering Stage
LPS Securities, Inc.,
Due Diligence Fee and
$   5,000
an Affiliate of
Broker's Commission
plus 10% of
Stephen R. Greenwald,
any Units
a General Partner
sold by LPS
Operating Stage
General Partners
Management Fee
$ 175,000
Present and continuing
Uncertain
1% interest in profit
and loss
Liquidation Stage
General Partners
Return of Capital Contribu-
$  10,000
tion after Limited Partners
receive their aggregate
Capital Contributions
1% interest in balance of
Uncertain
proceeds after Limited
Partners receive their
aggregate Capital Contribu-
tions and General Partners
receive their Capital
Contributions
Compensation to Others
R.A. Inbows, Ltd.
Marketing Consultant Fee
$ 370,000
an affiliate of
Ira N. Smith,
a General Partner
The *674 placement memorandum sets forth the following general investor suitability standard: (a) [The investor] is acquiring the Units for investment and not with a view to resale or distribution; (b) [the investor] can bear the economic risk of losing his entire investment; (c) [the investor] has a net worth of at least $ 500,000 multiplied by the number of Units to be purchased by him in the Partnership (exclusive of house, furnishings and automobiles) and anticipates he will continue to have in the future, annual taxable income, some portion of which will be subject to a Federal Income Tax rate of at least 45% after taking into consideration any losses which may result from this investment; (d) [the investor's] overall commitment to investments which are not readily marketable is not disproportionate to his net worth, and his investment in the Units will not cause such overall commitment to become excessive; * * * and (f) [the investor] (and his offeree representative, if one is utilized by him) have such knowledge and experience in financial and business matters that he is (they are) capable of calculating the merits and risks of this investment. * * * Each investor was required to represent *675 in writing that he satisfied the foregoing requirements. Pursuant to the placement memorandum, the partnership was to acquire the picture from Fox for a purchase price of $ 16,250,000. The purchase price was to consist of $ 500,000 paid in cash at the closing, $ 10,600,000 paid by delivery of a recourse note bearing interest at the rate of 15 percent per annum and maturing on March 15, 1994, and $ 5,150,000 paid by delivery of a nonrecourse purchase note (nonrecourse note) bearing interest at the rate of 15 percent per annum and maturing on March 15, 1994. The interest component of the recourse note was nonrecourse to the limited partners and to the partnership. The purchase notes would be payable prior to maturity only from certain gross proceeds from exploitation of the picture. Each limited partner would be personally liable, with respect to each unit purchased, for a maximum of 3.96 percent of the unpaid principal amount of, but not interest on, the recourse note. Each limited partner's maximum additional liability was $ 419,760 per unit purchased. The partnership would grant Fox a purchase money security interest (purchase lien) in the picture and certain proceeds from its *676 exploitation. The purchase lien would be subordinated by Fox to a prior lien to be granted to a bank to secure an acquisition and marketing loan of up to $ 3,010,000 which was to be incurred by the partnership. For the $ 16,250,000, the partnership would acquire title to and all rights in the picture in perpetuity throughout the world and in all media including theatrical, nonetheatrical and television rights, subject to a distribution agreement and the reservation by Fox of certain ancillary rights. The partnership would acquire various physical materials, including picture negatives, prints and necessary sound track material. The partnership's share of the gross proceeds derived from exploitation of the picture were to be determined as follows: Partnership's Share
Percentage
Gross Proceeds
of Gross Proceeds
20.0
- 0 -   - $  5,500,000
$ 1,100,000
0.0
$  5,500,001 -   11,000,000
- 0 -
11.5
11,000,001 -   41,000,000
3,450,000
5.0
41,000,001 -     Above   If [net proceeds were] greater than the aforementioned share of Gross Proceeds, the Partnership will receive 100% of Net Proceeds. In addition, the partnership was entitled to up to 100 percent of gross proceeds to the extent necessary to pay interest *677 on the acquisition and marketing loan and the purchase notes. The placement memorandum acknowledged that the motion picture industry is highly competitive and speculative, and only a small percentage of motion pictures generate a profit after recoupment of their cost. The placement memorandum further stated that the partners were not to receive distributions equal to their capital contributions unless and until gross receipts equaled $ 39 million, except to the extent made up out of television proceeds. The placement memorandum noted that this level of gross receipts substantially exceeded the average for all motion pictures. The placement memorandum listed a 16-page summary of risk factors associated with the investment. These included tax, operating and investment risks. The tax risks included partnership status, audit potential, disallowance of partnership deductions, status of the partnership as the sole owner of the picture in relationship to Fox, transactions entered into for profit, limitation on the deductibility of losses to the amount at risk, partnership deductions, depreciation of the picture, disposition of the picture and the partnership interest and the availability *678 of investment tax credits and tax law changes among others. Operating risks included competition in the motion picture industry, limited letters of credit, foreclosure, limited partnership funds, Fox's credit risks, limited cash flow and completion of the movie. Investment risks included restrictions on transfer of the picture, conflicts of interest, no right to manage and liability of limited partners. The placement memorandum included a section dealing with Federal, state and local tax consequences. A tax opinion was also available to the investors and was completed by the law firm of Carro, Spanbock, Londin, Fass & Geller at the request of the general partners. The tax opinion stated that no opinion would be rendered with respect to various income tax matters where the law was unclear or which turned on issues of fact such as the allocation of partnership profits and losses, whether the transaction had been entered into for profit and the fair market value of the picture. The offering summary projected that after-tax benefits generated by a single partnership interest would be in the following ratios of loss to net investment: Year
Ratio
1982
5.2-1
1983
3.5-1
1984
4.0-1
1985
4.0-1 The *679 confidential summary listed the projected after-tax benefits for a $ 174,000 investment as follows: PROJECTED AFTER-TAX BENEFITS FOR A $ 174,000 INVESTOR
LIMITED PARTNERSHIP INTEREST IN THE 55% TAX BRACKET
Gross Receipts - $ 20,000,000
Taxable
Tax
Cash
Investment
Capital
Income
Savings
Distri-
Tax
Contri-
(Loss) [1]
(Cost)
bution
Credit
butions [3]
1982
($ 210,835)
$ 115,959 $ 44,000
$ 53,600
1983
(  161,450)
88,798 37,080
1984
(  141,790)
77,985 $ 42,960
69,760
1985
(   60,560)
33,308 36,400
1986
0 0 1987
0 0 1988
0 0 1989
0 0 1990
0 0 1991
139,240 (76,582)
34,280
1992
139,240 (76,582)
34,280
1993
139,240 (76,582)
34,280
1994
158,960 (87,428)
34,280
Net Cumulative
Benefit
Net
Funds
Including
Annual
Net
Generated
Funds
(Investment)
Cumulative
By Net
Generated
Benefit
Benefit
Benefit [2]
Thereon
1982
$ 106,359 $ 106,359
$ 106,359
1983
51,718 158,077
$  8,509
166,586
1984
51,185 209,262
13,327
231,098
1985
(3,092)
206,170
18,488
246,494
1986
0 206,170
19,720
266,214
1987
0 206,170
21,297
287,511
1988
0 206,170
23,001
310,512
1989
0 206,170
24,841
335,353
1990
0 206,170
26,828
362,181
1991
(42,302)
163,868
28,974
348,853
1992
(42,302)
121,566
27,908
334,459
1993
(42,302)
79,264
26,757
318,914
1994
(53,148)
26,116
25,513
291,279
*680 The Sale Documents
By agreement dated June 16, 1982, the partnership purported to purchase the picture from Fox for $ 16,250,000. At the time the partnership purchased the picture, it also entered into a distribution agreement with Fox. Fox would not have entered into the purchase and sale agreement (purchase agreement) unless the partnership had agreed to simultaneously enter into the distribution agreement. The purchase agreement was amended by a letter dated June 16, 1982, which provided for total payments to Fox by the partnership as follows: Check
$  75,000
Short-term promissory note
325,000
Total down payment
$ 400,000
$    400,000
Purchase notes
Recourse note
8,500,000
Nonrecourse note
7,350,000
Total
$ 16,250,000
In the purchase agreement, Fox reserved certain rights in the picture including remake, sequel motion picture, legitimate stage, music publishing, sound track recording, merchandising, literary publishing, radio, live television and literary material rights. Fox reserved the following rights pertaining to copyrights: To secure copyright with respect to any and all *681 of the products resulting from the exercise of any and all rights reserved [by Fox] in [Fox's] own name anywhere in the world and to secure any renewals and extensions thereof wherever and whenever permitted. On June 16, 1982, Fox purported to assign to the partnership the copyright in the picture including the right to secure, register, renew and extend the copyright. However, all rights previously listed were excepted from the assignment. The copyright assignment was subject to terms and conditions contained in a supplemental agreement to copyright assignment (supplemental agreement). In the supplemental agreement, the partnership irrevocably appointed Fox as its sole and exclusive attorney-in-fact to secure, register, renew and extend all copyrights in the picture and all related properties. The supplemental agreement prohibited the partnership from changing the notice of copyright on the picture and gave Fox the right to sue in both its and the partnership's name for any copyright infringement. Any recovery arising from a copyright violation was to be retained by Fox. The Distribution Agreement
The partnership acquired the picture subject to the distribution agreement with *682 Fox which was dated June 16, 1982. Pursuant to the distribution agreement, Fox was to possess: the sole, exclusive right, license and privilege, throughout the world, to distribute, exhibit, advertise, publicize, transmit, project, perform, reissue, subdistribute, sublicense, lease, rent, exploit and generally deal in and with the Picture, trailers thereof, and excerpts and clips therefrom, and all rights therein of every kind and nature, and in any and all languages (including dubbed, titled, and narrated versions) in all sizes and gauges of film and other forms of Motion Picture Copies and for any and all purposes and uses, and by every means, method, process, medium or device now or hereafter known, invented, contemplated, developed, or devised, and to sublicense others so to do, including without limitation, the sole and exclusive right to exercise all rights of Theatrical Distribution, Theatrical Exhibition, Free Television Distribution, Free Television Exhibition, Pay Television Distribution, Pay Television Exhibition, Cassette Distribution, Cassette Exhibition, Non-Theatrical Distribution, Non-Theatrical Exhibition with respect to the Picture and trailers thereof and excerpts *683 and clips therefrom. * * * The initial term of the distribution agreement was 15 years from the initial release date of the picture. The distribution agreement term (the distribution term) was to be automatically extended on the same terms and conditions as follows: Aggregate
Through
Gross Proceeds
Automatic
Time Period
Equaling or Exceeding
Extension
Initial term
$ 10,000,000
10 years
1st extended term
15,000,000
20 years
2nd extended term
22,000,000 (or
30 years
at Fox's option)
Fox also had options to extend the distribution term for up to an additional 50 years, thus bringing the potential term of the distribution agreement to 125 years. The useful life of a motion picture is generally three-to-five years. There are instances, however, when a picture's useful life is less than three years and instances when a picture's useful life exceeds five years. As a general rule, a motion picture generates most of its theatrical gross receipts within three-to-five years of its release, but a motion picture may generate gross receipts for an indefinite period. The general terms of the distribution agreement were subsequently amended so that the partnership was entitled to receive the following percentages *684 of the picture's gross proceeds: Partnership's Share
Percentage
Gross Proceeds
of Gross Proceeds
16.0
-0-    - $  5,500,000
$  800,000 0.0
$  5,500,001 -   11,000,000
-0-
9.2
11,000,001 -   41,000,000
2,760,000
4.0
41,000,001 -   Above
If net proceeds exceeded the partnership's aforementioned share of gross proceeds, the partnership was to receive 100 percent of net proceeds. The partnership's share of gross proceeds was to first be applied toward the purchase notes and accrued interest. The entire amount of the recourse note was to be paid from the picture's gross proceeds. The distribution agreement defined net proceeds as follows: Total gross receipts less: Distribution fees Taxes, duties and governmental fees Checking and collection costs Trade association fees and assessments Guild payments and royalties Advertising costs Foreign version costs Prints and reediting costs Shipping/delivery costs Miscellaneous costs Conversion/transmission costs Gross participations Net participations Purchase notes Interest on purchase notes Fox's distribution fees were calculated as: (1) 35 percent of the first $ 10,000,000 of gross receipts; (2) 40 percent of the next $ 2,500,000 of gross receipts; and (3) *685 55 percent of gross receipts in excess of $ 12,500,000. Prerelease estimates indicated that distribution fees and participations would exceed $ 15,000,000. Prerelease estimates of revenue and expenses done by Fox indicated to Fox that the picture would have gross receipts from all sources of $ 23,500,000 and direct costs of $ 25,315,000 broken down as follows: Direct negative cost
$ 11,255,000
Participations
1,350,000
Theatrical distribution expenses
10,900,000
Television distribution expenses
1,810,000
$ 25,315,000
Prior to release of the picture, Fox had entered into licensing agreements with exhibitors which, provided all amounts were paid when due, would have provided the partnership with sufficient funds to satisfy the principal but not interest on the recourse note. Prior to release of the picture, Fox had entered into television licensing agreements with exhibitors which, provided all amounts were paid when due, would have provided the partnership with a return of its cash investment in the picture. No appraisals or prerelease estimates of revenue were done by or on behalf of the partnership or general partners with respect to the picture. Tax Treatment
On its 1982 Form 1065, U.S. *686 Partnership Return of Income (the partnership's return), the partnership claimed the following deductions: Guaranteed payments to partners
$     8,300
Depreciation
1,625,000
Other deductions
2,611,866
$ 4,245,166
The line item "Other deductions" was comprised of the following deductions: Amortization of organization costs
$     2,000
Tax advice
35,493
Marketing and advertising fees
2,200,000
Marketing consultants (Inbows)
370,000
Bank charges
40
Loan placement fee
3,333
Amortization
1,000
$ 2,611,866
Petitioners reported their distributive shares of the partnership's losses and ITC as follows: Petitioners
Year
Form
Loss
ITC
David and Barbara
1982
1040
$ 210,136
--
C. Markin
1980
1040X
--
$ 19,055
1979
1040X
--
24,951
Estate of Albert
1982
1040
105,068
22,028
Goldberg, etc.
Philip J. Kleiner
1982
1040
52,532
4,752  The picture was placed in service during 1982 for purposes of section 1.48-8(b)(5), Income Tax Regs. The partnership's return did not include the statement of production costs described in section 1.48-8(g)(3), Income Tax Regs.
The Partnership's Interest in the Picture
Respondent contends that the partnership does not possess sufficient attributes of ownership to be considered the owner of the picture for Federal income tax *687 purposes. Petitioners contend that the transactions between the partnership and Fox were motivated by business purposes, shifted the benefits and burdens of ownership of the picture to the partnership and were supported by economic substance. We agree with respondent. The economic substance of a transaction rather than the form in which it is cast is determinative of its tax consequences. United States v. Phellis, 257 U.S. 156, 168 (1921). Whether the partnership became the owner of the picture for tax purposes is a question of fact to be determined by reference to the written agreements read in light of the surrounding facts and circumstances. Tolwinksy v. Commissioner, 86 T.C. 1009, 1041 (1986); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). A sale occurs upon the transfer of the benefits and burdens of ownership rather than upon satisfaction of technical requirements for passage of title under state law. Grodt & McKay Realty, Inc. v. Commissioner, supra. When a transferor continues to retain significant control over transferred property, legal title fails to shift for tax purposes and the incidents of taxation attributable to ownership of the property *688 remain with the transferor. Durkin v. Commissioner, 87 T.C. 1329 (1986), affd. 872 F.2d 1271 (7th Cir. 1989); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982). For Federal tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture's copyright. See Bailey v. Commissioner, 90 T.C. 558, 607 (1988); Tolwinsky v. Commissioner, supra at 1042-1043. A sale has not occurred if the transferor retains proprietary rights in the motion picture. A motion picture copyright includes the exclusive rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public and display still photographs taken from the motion picture to the public. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective January 1, 1978). The partnership never acquired the benefits and burdens of ownership of the picture. Pursuant to the purchase agreement, the partnership acquired all of Fox's right, title and interest with respect to the ownership and exploitation throughout *689 the world of the picture for $ 16,250,000. However, Fox would not have entered into the purchase agreement unless the partnership simultaneously executed the distribution agreement with Fox, which transferred all of the basic rights associated with the copyright to Fox, leaving the partnership with a mere "bare copyright." See Madden v. Commissioner, T.C. Memo. 1989-162; Meister v. Commissioner, T.C. Memo. 1988-487; Isenberg v. Commissioner, T.C. Memo. 1987-269. Fox reserved remaking sequel rights, theatrical stage rights, all merchandising revenues, book publishing rights and all television and radio rights for its own accounts. Fox retained complete control over the exploitation of the picture. The distribution agreement stated that Fox should have "sole and absolute discretion" in the distribution of the picture. Fox alone had authority to edit, retitle, advertise, distribute or sell the picture. Through the distribution agreement, Fox retained virtually every right that it had allegedly transferred to the partnership under the purchase agreement, including the right to sue for copyright infringement in its own name. The rights retained by Fox constitute virtually the entire *690 bundle of rights comprising a copyright. Durkin v. Commissioner, supra at 1369. There is no evidence that the partnership had any control over the exploitation of the picture. To the contrary, the distribution agreement effectively prohibited the partnership from taking any action. The partnership's sole contribution was to be financial. The distribution agreement effectively provided that these rights would be retained by Fox perpetually. The distribution agreement provided for an initial distribution term of 15 years with extensions and options which would bring the potential term to 125 years. While a motion picture may generate gross receipts indefinitely, the parties agree that generally the useful economic life of a motion picture is three-to-five years. Fox purported to convey its ownership interest in the picture to the partnership, while in fact it retained exclusive control over the picture for a period of time far exceeding the projected useful economic life of the picture. The terms of the distribution agreement indicated that the partnership's investment was highly speculative. The quality of the picture and the prior success of those involved in it implied a potential *691 for financial success. No appraisals or prerelease estimates were done by or on behalf of the partnership or general partners which would have indicated the marketing potential of the picture as of the date the partnership entered into the agreements with Fox. The stipulated facts do not, therefore, support a finding that the partnership anticipated more than a return of capital. Our conclusion that Fox owns the picture does not require the transaction to be viewed as one which is wholly lacking in economic substance and disregarded for tax purposes. Rather, we view this transaction as one in which the partnership acquired an intangible contract right which is a depreciable interest and recognized for tax purposes. See Bailey v. Commissioner, supra at 614. Depreciation
Petitioners have conceded that the partnership may not include the amount of the nonrecourse note in the picture's depreciable basis. The issues for determination, therefore, are whether the partnership may include the amounts of the recourse note and the down payment in the depreciable basis of the intangible contract right. When a transaction is structured so that repayment of a putative debt by the taxpayer is *692 not probable, either because of the length of the terms of the debt, the source of the payments or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, the debt is not genuine indebtedness to be taken into account for purposes of determining a taxpayer's investment in property. Durkin v. Commissioner, supra at 1376; see also Tolwinsky v. Commissioner, supra at 1048-1050. Such a debt does not reflect an actual investment in property and cannot be included in the taxpayer's depreciable basis. Durkin v. Commissioner, supra at 1377. Prior to the release of the picture, Fox entered into licensing agreements with exhibitors which would have provided the partnership with sufficient funds to satisfy the principal but not interest on the recourse note and would have provided the partnership with a return of its cash investment in the picture. Pursuant to the distribution agreement, the partnership had no right to the remaining gross proceeds, except to the extent that they were used to satisfy the purported debt or return the partnership's cash down payment. These provisions would not apply unless gross receipts were insufficient under the general *693 terms of the distribution agreement to cancel the purported recourse debt. The absence of real liability on the partnership's notes, as well as the minimal risk the partnership assumed under the entire arrangement, is aptly described in petitioners' brief. With respect to why the partnership accepted the structure of the deal, petitioners acknowledge "Past experience shows that such films could do well or could do very poorly. The investors wished to share in any huge success but protect against a real failure. Therefore, the film was distributed with much of the costs guaranteed." The illusory recourse note must be disregarded. The partnership's depreciable basis in the intangible contract right is thus limited to the $ 400,000 down payment. We need not, therefore, discuss respondent's section 483 discounting argument. The parties have stipulated that the partnership may use either the income-forecast or straight-line method of depreciation. Upon the stipulated facts, we determine that the useful life of the contract right in issue was five years. See Meister v. Commissioner, supra.If the income-forecast method is used, the partnership will be required to recalculate its depreciation *694 deduction as provided in Bailey v. Commissioner, supra at 619-621. Investment Tax Credit
An investment tax credit may generally be claimed for a motion picture film if the film is "new section 38 property (determined without regard to useful life) which is a qualified film" and the taxpayer has an "ownership interest" in the film. Section 48(k)(1)(A). Section 1.48-8(a)(4), Income Tax Regs., defines the "ownership interest" required to claim the entire or partial credit with respect to a qualified motion picture: (4) Ownership interest -- (i) In general. To obtain the investment credit with respect to a qualified film, a taxpayer must have an ownership interest in at least a part of the film. That is, the taxpayer must have a depreciable interest in at least a part of the film. However, the amount of credit allowable to a taxpayer with respect to a qualified film is determined only on the basis of that taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of the qualified film. The proportionate share of any loss which may be incurred with respect to production costs by a taxpayer is the amount that the taxpayer's capital is at risk. *695 * * * * * * (iii) Certain lenders and guarantors considered to have an ownership interest. To qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least a part of the film if he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film. * * * For purposes of section 1.48-8, Income Tax Regs. , a part of a film "means the exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas over the entire period of substantial exploitation of the film in the medium(s) in the geographical area(s)." Section 1.48-8(a)(2), Income Tax Regs.
The partnership did not possess an ownership interest in any part of the picture for purposes of the investment credit. As previously discussed, the partnership *696 acquired no depreciable interest in the picture because Fox effectively retained all substantial rights in the picture, including the exclusive right to exploit the picture worldwide. Petitioners did not contend that the partnership was a lender or guarantor by virtue of the transactions with Fox, and we have rejected respondent's contention to that effect. Because the partnership did not possess an ownership interest within the meaning of section 1.48-8(a)(4), Income Tax Regs., petitioners are not entitled to an investment credit with respect to the picture. See Tolwinsky v. Commissioner, supra at 1063-1065. Accordingly, we need not address respondent's alternative arguments. Additions to Tax
Respondent has conceded that petitioners are not liable for additions to tax under section 6653(a). A. Section 6659. Section 6659 provides for an addition to tax with respect to underpayments attributable to a "valuation overstatement." Section 6659(a). A valuation overstatement has occurred "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis *697 (as the case may be)." Section 6659(c). On its 1982 return, the partnership claimed a basis in the picture of $ 16,250,000 and a depreciation deduction and ITC as a result. We determined that the partnership's correct basis in the intangible contract right for depreciation and ITC purposes was $ 400,000 and zero, respectively. Valuation overstatements have occurred in this case for purposes of depreciation and ITC because the bases reported on the partnership's 1982 return exceed the correct bases, respectively, by at least 150 percent. Helba v. Commissioner, 87 T.C. 983, 1014-1015 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988). The valuation overstatements resulted in underpayments of petitioners' taxes for each of the years in issue. Because the valuation overstatements each exceed 250 percent of the correct respective amounts, the applicable percentage is 30 percent. Section 6659(b). The portions of the underpayments attributable to the partnership's depreciation deduction and disallowed ITC are subject to the addition to tax under section 6659(a). B. Section 6621(c). Next, we turn to the addition to tax under section 6621(c) which the parties have *698 stipulated is at issue, and we therefore treat the issue as having been properly raised. The burden of proof is on respondent because the additions were not included in the statutory notices and, therefore, are new issues. Rules 122(b) and 142(a). Section 6621(c) generally provides for an increase in the rate of interest to 120 percent of the otherwise applicable annual rate with respect to a substantial underpayment (an underpayment of at least $ 1,000) attributable to one or more tax-motivated transactions. Section 6621(c)(1). Additional interest accrues after December 31, 1984, regardless of the filing date of the returns. DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988). Based on our conclusion that section 6659 is applicable, section 6621(c) also applies to the same portions of the underpayments. Section 6621(c)(3)(A)(i). Zirker v. Commissioner, 87 T.C. 970, 981 (1986). We note that section 6621(c) may also apply to additional underpayments determined as a result of the parties' stipulation to be bound by the final determinations in Madden v. Commissioner, supra.
C. Section 6661. Section 6661 generally provides that a certain percentage *699 of the amount of a substantial understatement of income tax shall be added to the tax. Section 6661(b)(3) provides: (3) COORDINATION WITH PENALTY IMPOSED BY SECTION 6659. -- For purposes of determining the amount of the addition to tax assessed under subsection (a), there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659 (relating to addition to tax in the case of valuation overstatements). Therefore, because we have determined that portions of petitioners' 1982 underpayments resulted from valuation overstatements under section 6659, the section 6661 addition to tax is inapplicable to those portions. We note that section 6661 may apply to additional underpayments determined as a result of the parties' stipulation to be bound by the final determinations in Madden v. Commissioner, supra.
An appropriate order will be issued. Footnotes
1. Cases of the following petitioners have been consolidated herewith: Estate of Albert Goldberg, Deceased, Rose Goldberg, Arthur Goldberg and Gary Goldberg, Executors and Rose Goldberg, docket No. 19805-86; and Philip J. Kleiner, docket No. 27384-86.↩
1. Includes $ 10,000 contributed by General Partners. 2. An Affiliate of a General Partner, LPS Securities, Inc., will receive sale commissions, up to $ 436,000, on sales of Units reflected by such Affiliate. ↩
3. Payable to R.A. Inbows, Ltd., an affiliate of Ira N. Smith, one of the General Partners, in consideration for consultant services to be rendered to the Partnership in connection with the release, distribution and marketing of the Picture, particularly in the exercise of the Partnership's rights of consultation under the distribution agreement. ↩
4. Payable to European-American Bank, in consideration for placement of Additional Financing.↩
1. Taxable income (loss) is computed on an individual basis upon the "at risk" provisions of section 465 of the Internal Revenue Code↩. 3. Includes interest on the limited partners' capital contributions.↩
2. Assuming taxpayer invests total net investment benefits in securities or other properties yielding 8% after taxes.↩