T.C. Memo. 2007-70

UNITED STATES TAX COURT

GEORGE A. LOVENGUTH, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9708-02.                    Filed March 27, 2007.

Charles A. Simmons and David Bunning, for petitioner.

Robert W. Mopsick, for respondent.

MEMORANDUM OPINION

HOLMES, Judge:  George Lovenguth is a U.S. Marine and a
combat veteran of the Vietnam War.  He left the service with an
honorable discharge and a crippling case of posttraumatic stress
disorder.  This disability has led him to endure long periods of
homelessness punctuated by stays at Department of Veterans
Affairs (VA) mental health facilities.  It has also brought him

tax trouble--important notices from both the IRS and this Court have failed to reach him, and the accrual of interest led a small tax debt to grow into a large one. In an effort to win abatement of that interest, he filed a petition in this Court; representing himself, he agreed to stipulations that would amount to conceding his case. *Pro bono* counsel have now entered an appearance on his behalf, and they have moved to relieve him of this stipulation and have the case proceed to a reasonable settlement or trial on the merits.

## Background

Lovenguth enlisted in the U.S. Marine Corps in January 1969 when he was only 17. He fought as a helicopter gunner in Vietnam, receiving a Combat Action Ribbon and Air Medal. In 1971, however, he was discharged after developing severe psychological problems, since diagnosed as posttraumatic stress disorder (PTSD). A return to civilian life did not cure him. Though he seems to have earned some income in 1988 and 1989,[1] by 1990 his illness overwhelmed him and he became homeless for several months before being involuntarily hospitalized. It was during his hospitalization that he was diagnosed as having PTSD, which led the VA to classify him as a 100-percent service-

---

[1] The IRS has long since destroyed its records on Lovenguth for those years, leaving behind only the notices of deficiency that it sent him and the record of the assessments that they led to.

connected disabled veteran.  This triggered a large, lump-sum payment (much of which Lovenguth set aside for his son's future education) followed by periodic disability checks.  He remained hospitalized off and on until early 1994.

During this time, the Commissioner sent him two notices of deficiency: the first, sent in December 1991, asserted a deficiency of a little over $1,000 for 1988; the second, sent in May 1992, asserted a deficiency of about $4,000 for 1989. Lovenguth apparently never received the notice of deficiency for 1988, and so he never filed a petition.  He did manage to file a timely petition for the 1989 year.  Although a notice for Lovenguth's court date was sent, Lovenguth claims that he never received it.  Given that he was involuntarily committed when it was sent, this is at least plausible.  Our own records show that we dismissed his case when he failed to appear after it was called from the calendar.  Though the merits of the notices of deficiency for both the 1988 and 1989 tax years were never adjudicated, the Commissioner assessed both deficiencies under the default rules in the Code.

After making these assessments, the Commissioner sent several notices to Lovenguth's last known address to try to collect.  His last known address, though, was the home that he had shared with his former wife many years before.  Their relationship had not improved with his mental illness and

homelessness--even if she had cared to forward his mail, it is likely that she was in touch with him only very rarely. Lovenguth plausibly claims not to have received any further communications from the Commissioner until May 2000, when the Commissioner sent him a letter reminding him of the balance due and telling him that collection might entail seizing his wages and property, though the Commissioner seems never to have sent him a collection due process notice.  Lovenguth reacted by selling the bonds he had bought with his lump-sum disability payment, and sending almost $18,000 (interest having compounded for over a decade) to the IRS to pay his entire tax liability-- simply to "stop the bleeding" as he put it.  He then filed a claim for refund and request for abatement of interest--the interest having become the overwhelming majority of the amount he paid.  The Commissioner denied them.  Lovenguth then timely filed a request for review of that determination in this Court pursuant to section 6404(e).[2]

Lovenguth, who was acting *pro se*, was apparently unclear about his relationship with Commissioner's counsel.  A comment made during a conference call led him to believe that the IRS counsel was there to help, rather than represent the

---

[2] Unless otherwise noted, all section references are to the Internal Revenue Code; all Rule references are to the Tax Court Rules of Practice and Procedure.

Commissioner.  He was also led to believe that he had to sign the stipulation of facts immediately or he would not be able to do so later.  It was only when Commissioner's counsel informed Lovenguth in a later telephone conversation that he would "eat [him] up in court" that Lovenguth realized he was mistaken.

Much of the resulting stipulation of facts is in the form that our Court sees in nearly every case--a list describing attached documents, noting that the "truth of assertions in stipulated exhibits is not necessarily agreed to and may be rebutted or corroborated by additional evidence."  Such stipulations of routine evidence are essential to orderly procedure in a high-volume court like ours.

But these stipulations also include a number of paragraphs aimed at stating what Lovenguth's testimony would be--not its truthfulness, simply what it would be.  Even Lovenguth's documents that were attached to the stipulation were included not for the truth of any statements they contained but as "indicating" that those statements were made in the documents themselves.

A motion to submit the case as fully stipulated under Rule 122 was filed at the same time as the stipulation of facts. However, the stipulations do little to prove Lovenguth's case-- they actually prohibit Lovenguth from pointing to any useful evidence--and if the order granting the Rule 122 motion were not

vacated, it would force the Court to decide the case solely on this paltry record. Noting the extreme disparity in legal skills[3] and its probable effect on the ability of the judicial process to reach a just result, *pro bono* counsel stepped in to represent Lovenguth. Those counsel completed their review of the spotty record and have now moved to vacate or modify the stipulations so that the case can be decided on its merits.

As reformulated by counsel, Lovenguth bases his claim for interest abatement on three arguments. The first is that he was incompetent to attend to his daily living activities, let alone litigation in this court, when his original deficiency case was dismissed for lack of prosecution. The second is that the Commissioner failed to make the necessary efforts to contact him, which resulted in a large portion of the interest Lovenguth was forced to pay. His third claim, which is an extension of the second, is that because his VA benefits were paid out of Treasury funds and the IRS is part of the Treasury, the Commissioner should have been able to locate him. Lovenguth believes that had the Commissioner contacted him in a timely manner, he would have been able to satisfy both his tax liability and the then much smaller interest liability out of his lump-sum VA payment.

---

[3] Here, for instance, is Lovenguth's entire brief on the merits, which he wrote in longhand: "I request my abatement of be approved. The Dept. Treasury have been sending me my compensation payment for 100 percent service-connection since 1991. IRS clearly knew my addresses."

There are also other possible issues in this case that are untouched by the stipulations in their present condition:

! Should the Commissioner's communications with Lovenguth after the enactment of the IRS Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 685, have triggered a collection due process notice and hearing?

! Is section 6511(h)--suspending the running of the statute of limitations when an individual "is unable to manage his financial affairs" if even a part of a tax liability remains unpaid--relevant to this case? and,

! Is section 6334(a)(10) implicated if Lovenguth in fact paid these taxes from assets traceable to disability payments?

We list these not as issues about which we've formed any conclusions, but as issues noticeable to a trained eye that went unnoticed by a petitioner suffering from severe disability yet trying to represent himself. Unless the Court sets aside the stipulations and vacates its order submitting the case for decision under Rule 122, Lovenguth will not be able to present the facts and make the arguments that could prove his case.

## Discussion

The stipulation process is the bedrock of Tax Court practice. Branerton Corp. v. Commissioner, 61 T.C. 691, 692 (1974). Because we are a high-volume court, we use the stipulation process to encourage settlement and streamline trials by requiring parties to "stipulate, to the fullest extent to which complete or qualified agreement can or fairly should be reached, all matters not privileged which are relevant to the

pending case." Rule 91(a). Put another way, the stipulation process requires the "voluntary exchange of necessary facts, documents, and other data between the parties * * *." Branerton, 61 T.C. at 692. The process works because the parties are bound by the stipulations. Rule 91(e). And this means that we "will not permit a party to a stipulation to qualify, change, or contradict a stipulation * * * [unless] justice requires." Id.

With "justice" as our standard, we do have broad discretion to determine when it is appropriate to set aside a stipulation. Blohm v. Commissioner, 994 F.2d 1542, 1553 (11th Cir. 1993), affg. T.C. Memo. 1991-636; Estate of Eddy v. Commissioner, 115 T.C. 135, 137 n.4 (2000). However, our discretion is tempered by the importance of making stipulations stick--we enforce stipulations unless not just "injustice," but "manifest injustice" would result. See Bokum v. Commissioner, 992 F.2d 1132, 1135-36 (11th Cir. 1993), affg. 94 T.C. 126 (1990).

The Commissioner cites Saigh v. Commissioner, 26 T.C. 171, 177 (1956); Bakare v. Commissioner, T.C. Memo. 1994-72, and similar cases as additional constraints on our discretion. In Saigh, 26 T.C. at 177, we restated the general rule that a "stipulation is in all essential characteristics a mutual contract by which each party grants to the other a concession of some rights as a consideration for those secured and the settlement stipulation is entitled to all of the sanctity of any

other contract."  We do regard settlement stipulations as contracts, requiring proof of mutual mistake, coercion, duress, or some other contractual defenses before we would choose not to enforce them.  See, e.g., <u>Korangy v. Commissioner</u>, 893 F.2d 69, 72 (4th Cir. 1990) (unilateral mistake), affg. T.C. Memo. 1989-2; <u>Saigh</u>, 26 T.C. at 180 (reliance on false representation of the other party).

But in this case Lovenguth has asked us to set aside only a "stipulation of fact" drafted in preparation for trial.  And, as we noted in <u>Stamm Intl. Corp. v. Commissioner</u>, 90 T.C. 315, 321 (1988), "more stringent standards" should be applied to motions to vacate a settlement agreement than to pretrial stipulations of fact.  We do allow relief from both types under general principles of contract law, see <u>Mathia v. Commissioner</u>, T.C. Memo. 2007-4; <u>Markin v. Commissioner</u>, T.C. Memo. 1989-665, but the plain language of our rule governing pretrial stipulations-- allowing relief from stipulations if justice requires--allows us to consider factors that might not be sufficient to upset a contract.

The most common situation is where the stipulation is contrary to facts brought out at trial.  See <u>Blohm</u>, 994 F.2d at 1553; <u>Jasionowski v. Commissioner</u>, 66 T.C. 312, 318 (1976).  It is true that there has been no trial here, but such cases are still relevant for showing that something less than a contractual

defense is a permissible ground for letting one party to a pretrial stipulation out of his agreement. Courts have identified numerous factors, and their importance is almost always dependent on the particular context. One such factor is whether both sides were represented by counsel when agreeing to the stipulation. See, e.g., Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d 261, 263 (5th Cir. 1961); Jenkins v. Commissioner, T.C. Memo. 1988-326. This makes sense--the participation of attorneys in drafting stipulations is more likely to result in a fair and balanced presentation of the facts, even as their participation in creating a trial record presumably makes it more likely that relevant and material evidence will be admitted.

Another factor is whether the party opposing a motion for relief from stipulations can point to evidence that has been lost or to arguments that might have been made but no longer can be. Courts are thus especially unlikely to grant relief from stipulations when the request is made for the first time in a posttrial brief, see La. Land & Exploration Co. v. Commissioner, 90 T.C. 630, 649 (1988), or on appeal, see United States v. 3,788.16 Acres, 439 F.2d 291, 296 (8th Cir. 1971).

And even apart from whether a party was represented during the drafting of stipulations and whether prejudice would result from granting relief is the question of whether the stipulations

were entered into after careful negotiations or through inadvertence or honest lack of ability.  Courts are unlikely to grant relief from stipulations arrived at through bargaining and "considerable negotiation," Associated Beverages, 287 F.2d at 263, or stipulations which were "negotiated extensively," Markin, T.C. Memo. 1989-665.  But when a party has stipulated inadvertently and honestly, courts may justifiably grant him relief.  See, e.g., United States v. Montgomery, 620 F.2d 753, 757 (10th Cir. 1980); Jenkins, T.C. Memo. 1988-326.

This case--at least before counsel stepped in to help Lovenguth--falls more on the side of Jenkins and Montgomery. Lovenguth was not represented when the stipulations were being drafted; the stipulations themselves were not so much negotiated as given to him to sign; and all this happened well before posttrial briefing or appeal.

The Commissioner argues that Lovenguth should have to show that a failure to modify the stipulations would prejudice him. See Adams v. Commissioner, 85 T.C. 359, 375 (1985).  The Commissioner reasons that deciding the case with the current stipulations would not prejudice Lovenguth because he has offered no new evidence that would change the result of the case and all of the pertinent facts are included in the current stipulation. These arguments fail to persuade us.

Consider the argument that Lovenguth will not be prejudiced

because "[a]ll of the pertinent facts which the petitioner wishes to include at trial are already stated within the stipulation of facts as it is presently constituted." This argument might be persuasive if the stipulations were the product of real negotiation, but as far as we can tell, the Commissioner's counsel wrote the stipulations himself and included Lovenguth's arguments by guessing what he would testify to at trial. Having the opposing party decide what factors are pertinent is not the voluntary exchange we had in mind in Branerton. This is especially true given that Lovenguth's new counsel has identified new issues that were omitted from the stipulation.

We think, though, that the decisive factor here is that Lovenguth did not understand the stipulation process itself. We do agree that he understood that he faced a deadline to enter the stipulation of facts--Commissioner's counsel called him more than a dozen times in two weeks to remind him. But Lovenguth learned only two days before the deadline that the person calling him was not his friend, but someone who was going to "eat [him] up in court." Lovenguth responded to this pressure, and his fears, by signing the stipulation that he thought the Commissioner's counsel was assisting him with. We also acknowledge that, on a human level, Commissioner's counsel was faced with a *pro se* litigant who was "confrontational and belligerent"--reasonably leading him to think that writing the stipulations himself was

doing better by Lovenguth than moving for a dismissal of the case for failing to properly prosecute. See generally Levy v. Commissioner, 87 T.C. 794 (1986) (discussing effects of case dismissal).

But we must also look at the process from Lovenguth's perspective. And in doing so, we must remember that Lovenguth has no legal training and is suffering from a weakened mental and physical condition. This case is not the first time Lovenguth tried to challenge the IRS in our Court. Some of his attempts were unsuccessful because he missed deadlines, and when he learned that his untimeliness was partly responsible for his tax liability tripling, he was understandably fearful.

The Commissioner nevertheless argues that Lovenguth always knew that the IRS was his adversary and never believed that he was being assisted. We agree that Lovenguth did know the IRS was his adversary in that it was trying to collect a debt from him. But Lovenguth also knew that the IRS offered help, because he had actually been referred to the IRS's Taxpayer Advocate Service at one time. And so we find it reasonable that Lovenguth believed that the Commissioner's counsel was assisting him and not just playing the role of his adversary.

The Commissioner finally argues that Lovenguth has capacity to enter into the stipulation because he is "cognizant enough" to request an abatement of interest. The Commissioner argues that

if Lovenguth has been competent enough to "handle his own affairs" since leaving the VA hospital in 1995, then he is competent enough to enter into a stipulation of facts. See Bakare, T.C. Memo. 1994-72.

To suggest that Lovenguth understood the consequences of signing the stipulation of fact just because he is no longer institutionalized would be too high a hurdle. The Rule tells us to look not at whether a petitioner has the bare competence sufficient to avoid involuntary commitment, but to the justice of the particular situation. We do wish to stress that we do not believe that IRS counsel is in any way guilty of misconduct--in an adversarial system, counsel is expected to zealously represent his client. It is just that in the peculiar circumstances of this case--with a mentally disabled and sometimes voluble taxpayer representing himself--it is very easy to create a situation of deep misunderstanding between the parties. In this case we conclude that justice requires us to set aside the stipulation of facts and vacate the order submitting the case for decision on that stipulation.

An appropriate order will be issued granting petitioner's motion.